J-S68016-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

IN THE INTEREST OF: G.A.S., A MINOR

APPEAL OF: H.M., FATHER

: IN THE SUPERIOR COURT OF
:        PENNSYLVANIA
:
:
:
:
: No. 2062 EDA 2015

Appeal from the Order entered May 27, 2015,
Court of Common Pleas, Montgomery County,
Orphans' Court at No. 2015-A0065

BEFORE:  BENDER, P.J.E., DONOHUE and MUNDY, JJ.

MEMORANDUM BY DONOHUE, J.:        **FILED NOVEMBER 12, 2015**

H.M. ("Father") appeals from the order entered by the Court of Common Pleas, Montgomery County, on May 27, 2015, granting the petition filed by the Montgomery County Office of Children and Youth ("OCY") to involuntarily terminate his parental rights to G.A.S. ("the Child") pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (8), and (b).  Upon review of the record and the applicable law, we affirm.

A brief summary of the factual and procedural history is as follows.  In August 2009, M.S. ("Mother") gave birth to the Child.[1]  Mother did not identify the Child's father on the Child's birth certificate.  On September 19, 2013, OCY filed a dependency petition, asserting that the Child was without proper care or control.  In October 2013, the Child was adjudicated dependent, and along with his biological half-sister, was placed into foster

---

[1]  On May 27, 2015, Mother voluntarily relinquished her parental rights to the Child.  This appeal involves the termination of Father's parental rights only.

care. Mother initially did not provide any information about the Child's father to OCY, but at some point in 2014, she disclosed to OCY that Father was the Child's biological father.

In November 2014, OCY located Father in a Philadelphia jail where he was incarcerated. Robert Newton ("Mr. Newton"), the Child's caseworker, visited Father in jail and told him that Mother indicated he was the father of the Child. Father admitted that he had sexual relations with Mother and learned from Mother in the early stages of her pregnancy that she was pregnant, but claimed that at the time, he did not believe her. Father also alleged that Mother disappeared after she told him that she was pregnant. Father nevertheless expressed that he would be released from incarceration in July 2015 and would be interested in being involved in the Child's life if DNA tests determined he was the father.

On March 18, 2015, OCY filed a petition for involuntary termination of Father's parental rights as the putative father. The trial court scheduled a hearing for May 27, 2015. A paternity test was completed two weeks prior to the hearing. On the morning of the hearing, Father learned that the paternity test confirmed that he was the father of the Child.

At the hearing, the trial court heard testimony from the Child's foster mother, Mr. Newton, and Father. After hearing the testimony, the trial court granted OCY's petition to terminate Father's parental rights pursuant to sections 2511(a)(1), (2), (8), and (b) of the Adoption Act. Father timely

filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On appeal, Father raises the following two issues for our review:

> 1. Did the honorable trial court commit error in terminating the parental rights of Father, pursuant to 23 Pa.C.S.A. [§] 2511(a)(1), when the testimony at trial demonstrated that Father had been prevented from having an opportunity to provide parental duties and, indeed, did not learn that he was the father until very shortly (hours) before the May 27, 2015 trial?
>
> 2. Did the honorable trial court commit error by involuntarily terminating Father's parental rights where the facts did not establish by clear and convincing evidence that such termination was in the best interests of the Child as contemplated by 23 Pa.C.S.A. § 2511(b)[?]

Father's Brief at 4.

Our standard of review in cases involving termination of parental rights is as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

***In re J.F.M.***, 71 A.3d 989, 992 (Pa. Super. 2013) (citing ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009)). If the trial court's decision is supported by competent evidence, this Court must affirm the decision "even if the record could also support the opposite result." ***Id.*** (citing ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa. Super. 2003)).

Involuntary termination of parental rights is governed by statute. Section 2511 of the Adoption Act provides, in pertinent part:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \* \* \*
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to

exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(a)(1), (2), (8), (b).

In its analysis under section 2511, "the trial court must engage in a bifurcated process." *In re B.C.*, 36 A.3d 601, 606 (Pa. Super. 2012).

The initial focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies at least one of the nine statutory grounds in section 2511(a). If the trial court determines that the parent's conduct warrants termination under section 2511(a), then it must engage in an analysis of the best interests of the child under section 2511(b), taking into primary consideration the developmental, physical, and emotional needs of the child.

*Id.*

In this case, the trial court terminated Father's rights under sections 2511(a)(1), (2), and (8). In his brief, Father assails the trial court's determination with respect to sections 2511(a)(1) and (a)(2). Father makes no argument regarding the trial court's determination with respect to section (a)(8). Thus, Father essentially concedes that the trial court's termination of

- 5 -

his parental rights pursuant to section (a)(8) is without error, and we could affirm on that basis, as it is well settled that "[w]e need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm." *In re Adoption of C.J.P.*, 114 A.3d 1046, 1050 (Pa. Super. 2015) (citing *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004)). For purposes of completeness, however, we focus our review of this case on the arguments Father presents with regard to section (a)(1).

In order to prevail on its petition for involuntary termination under section 2511(a)(1), OCY was required to establish that in the six months preceding the filing of the petition, Father "refused or failed to perform parental duties." 23 Pa.C.S.A. § 2511(a)(1). Our Supreme Court has defined parental duties as follows:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent "exert himself to

- 6 -

> take and maintain a place of importance in the child's life."

*In re D.J.*, 2015 WL 6167408, at *2-3 (Pa. Super. April 28, 2015) (quoting

*In re Burns*, 379 A.2d 535, 540 (Pa. 1977)).

In reviewing whether Father failed to perform his parental duties, we are mindful that

> [a]lthough it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (internal citations omitted).

The trial court in this instance found that Father failed to perform his parental duties:

> In this case, the [c]ourt has established that for the six months prior to the filing of the petition[, Father] failed to perform parental duties. [Father] was advised by the woman with whom he had the relationship that she was pregnant and made no effort for the first five years of [the Child]'s life to inquire about [Mother], [the Child], or any of his circumstances and made no effort to have a role in [the Child]'s life during that time.
>
> It's true that [Father] was not specifically informed by Mr. Newton of [OCY] who himself was

not aware of it until October or November of 2014, was not informed until November of 2014 that he was considered likely by the [OCY] to be the father of [the Child]. At that time, he was in jail.

But, nevertheless, as the evidence established upon cross-examination, [Father] made no specific efforts to begin contact with [the Child], to send letters or presents to [the Child], to ask for additional information about [the Child], to establish a relationship with [the Child]. His efforts were limited to his request for DNA testing to confirm whether or not he was the father of [the Child] and his suggestion to Mr. Newton that he would like to create a relationship with [the Child] after his release from prison. This deferred interest in parenthood is simply not adequate to meet the requirements of providing parental care, supervision, support, nourishment to a child that every child needs.

As a consequence of his own actions and inactions, [Father] has not established a relationship with [the Child].

N.T., 5/27/15, at 97-98. After our review, we conclude that the record supports the trial court's findings.

Father asserts that he did not know he was the father of the Child until moments before the hearing began and argues that "[i]t is fundamentally unfair to expect a parent to preserve a parental relationship that the parent does not know exists." Father's Brief at 13-14. Although it is undisputed that Father received the results from the paternity test confirming that he was the father of the Child on the day of the hearing, testimony offered at the hearing revealed that he learned from Mother that she was pregnant with the Child when she was in the early stages of her pregnancy. N.T.,

5/27/15, at 77, 88. Father asserted that he did not believe Mother and never saw Mother again, but also admitted that he did nothing further to ascertain whether Mother had a baby or confirm that the child she was carrying was his. *Id.*

Moreover, at the time Mr. Newton informed Father in November 2014 that Mother named him as the Child's father, Father expressed that he was eager to learn if he was the father, but did not request to take a paternity test or demonstrate any urgency in taking a test. *Id.* at 58, 63-64. Mr. Newman left his contact information with Father, yet Father only called Mr. Newton once between November 2014 and April 2015 to inquire about taking a paternity test. *Id.* at 67. Father made no efforts to contact the Child, did not send any mail or gifts to the Child, and did not ask about the Child. *Id.* at 66-67. Thus, although Father stated that he wished to be involved in the Child's life if he was the father, he made no efforts to do so, instead stating that he would consider it once he received the DNA results. *Id.* at 50-51, 60-61.

Father's assertion that it is fundamentally unfair to expect him to preserve a parental relationship that he does not know exists is wholly unsupportable under the law. *See* Father's Brief at 14. To the contrary, this Court has held that a father cannot wait until he receives the results of a paternity test to perform parental duties, as this "rationale would relieve all fathers of their parental duties until their parentage was confirmed by a

paternity test." *In re Z.S.W.*, 946 A.2d 726, 731 (Pa. Super. 2008). Accordingly, as the record reflects that Father made no efforts to contact the Child or to perform parental duties during the five years of Child's life, we agree with the trial court's determination that OCY satisfactorily established that Father failed to perform parental duties in excess of six months pursuant to section 2511(a)(1).

For his second issue on appeal, Father challenges whether, under subsection (b), termination of Father's parental rights would best serve the developmental, physical, and emotional needs and welfare of the Child. This Court has held that in considering the child's needs and welfare under subsection (b),

> it is imperative that a trial court carefully consider the *intangible* dimension of the needs and welfare of a child – the love, comfort, security, and closeness – entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the [child]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*In re Adoption of K.J.*, 936 A.2d 1128, 1134 (Pa. Super. 2007) (citing *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000)). "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster

parents." ***In re T.S.M.***, 71 A.3d 251, 268 (Pa. 2013) (citing ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012)).

In this case, the trial court found, and the record establishes, that the Child is bonded with his foster family. N.T., 5/27/15, at 99. The Child's foster mother testified that the Child calls his foster parents "mom" and "dad." ***Id.*** at 24. The foster mother further testified that she has told the Child that she and her husband would adopt him. ***Id.*** at 18. The Child has already chosen his adoption name, to include his foster parents' last name, and is very proud and excited about the name he has chosen. ***Id.***

The record further establishes that the Child is responding well to his placement with his foster parents. When the Child was first placed with his foster parents, he had severe asthma, which resulted in several admissions to the hospital. ***Id.*** at 10. Since being placed with his foster parents, however, they have been able to manage his asthma. ***Id.*** at 11. Furthermore, the Child's foster mother testified that when he was placed with her family, he was four years old and still wearing a diaper. ***Id.*** at 10-11. Although he still occasionally has accidents, they occur less frequently. ***Id.*** at 11. The Child, who previously experienced night terrors regularly, "which consisted of him waking up and screaming at the top of his lungs, terrified[,]" did not experience any night terrors in the eight months leading up to the hearing. ***Id.*** at 12. The Child is also reportedly "doing exceptionally well" in school. ***Id.*** at 27.

Finally, the Child's foster family is also caring for his biological half-sister and they have expressed an interest in adopting her. *Id.* at 18. Mr. Newton testified that the Child and his sister, who are approximately one year apart in age, have always lived together, spend all of their time together, and love each other. *Id.* at 54.

After our review of the record, we conclude that the trial court's decision that termination of Father's parental rights to the Child would best serve the Child's needs and welfare is supported by competent evidence. The Child is bonded with his foster family, which provides him with the necessary parental care that the Child needs. The permanence and stability offered by the foster family best serves the developmental, physical, and emotional needs of the Child, evidenced by the Child's improved health, success in school, and the Child's desire to remain with and be adopted by the foster family. The record also reflects that termination of the Father's parental rights would not have a detrimental impact on the Child as Father and the Child have never met or communicated in any way. As a result, we conclude that subsection (b) has been satisfied in this case. Accordingly, we affirm the trial court's decision to terminate Father's parental rights.

Order affirmed.

J-S68016-15

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/12/2015